IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

ARTHUR LEE GRIGGS,                    :
Plaintiff,                           :
                                     :
vs.                                  :        CIVIL ACTION 16-0626-TFM-MU
                                     :
JEFFERSON DUNN, *et al.*,             :
        Defendants.                  :
                                     :

## REPORT & RECOMMENDATION

Plaintiff Arthur Griggs, an Alabama prison inmate proceeding *pro se* and *in forma pauperis*, filed a complaint under 42 U.S.C. § 1983. This action has been referred to the undersigned for appropriate action pursuant to 28 U.S.C. § 636(b)(1)(B) and S.D. Ala. GenLR 72(a)(2)(R).   After careful review, it is recommended that summary judgment should be **GRANTED in part** and **DENIED in part**, for the reasons discussed herein.

I.      **Summary of Factual Allegations**.[1]

A.  **Complaint.**

Plaintiff Griggs alleges that members of the Alabama Department of Corrections Emergency Response Team ("CERT Team") used excessive force against him on November 9, 2016.[2]  According to Plaintiff, on Nov. 9 at approximately 6:30 a.m., over 50 CERT Team members entered Holman Correctional Facility's Bravo Unit (B-Dorm), armed in full riot gear, and immediately began assaulting inmates "like they were Animals, without provocation, because the majority of the inmates were Harmlessly asleep." (Doc.

---

[1]     The "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." Priester v. City of Riveria Beach, 208 F.3d 919, 925 n.3 (11th Cir. 2000).

[2]     Throughout this report, the undersigned will refer to the incident subject of this complaint as both the November 9, 2016 incident and the Nov. 9 incident.

1 at 6).   Plaintiff alleges the assaulting of inmates continued for approximately 35-45 minutes, when the CERT Team placed plastic restraining ties (zip ties) on the inmates, instructed them to lie face down on their beds, and other CERT Team members continued to "parade" up and down the dormitory "still assaulting and Harassing the inmates and making statements belittling the inmates and making fun of those that had Gang Affiliation."[3]  (Id.).  Plaintiff acknowledges that some of the assaulted inmates were taken to the infirmary but contends many were not.  Plaintiff asserts that the inmates who were refused a body chart were instructed to sign up for sick call; thus, they did not receive medical treatment until days later.  Plaintiff specifically alleges in his complaint:

> Three CERT Team members, along with Captain Fails, came to my bed (BRAVO UNIT B-90), while I was laying on my face with my hands restrained behind my back, I was instructed to get up and two of the CERT Team members grab me by my arms and pick me up off my bed while the other CERT Team member struck me with his fist twice to the my face, knocking my teeth and partial plate out of my mouth, I turned around and ask them why they were beating on me and they threw me back on the bed and I saw Captain Fails laugh as they walked off, after the CERT Team had lined the inmates up to cut the Plastic Tyes off them, when they cut my Tyes I ask to go the infirmary because my jaw was hurting and was told to get back to my bed before they beat my ass again, after they exited the building I ask the dorm officer to allow me to go to the infirmary to get a bodychart and Treatment for my injuries and was told that the nurses said that they had been instructed to not see anymore inmates from Bravo Unit, That I needed to fill out a sick call request slip, in which I did and was not seen by the nurses until several days later, and had to have the root of the teeth knock out extracted, and my partial plate has not been found, and the dental refuse to replace the plate on the basis that I am not qualified, when it's a known fact that I already had a place before the CERT Team Members knocked out and destroyed it.

---

[3]     Plaintiff claims the CERT Team made "statements like: 'Where the GD's, Crips and Bloods at now', 'Aryan Brotherhood and Nations where yall at', 'on C.E.R.T. We will beat your Ass', Yall Bitches and Fuck Niggers stood up the other day Standup now' . . . 'Yall stabbed Warden Davenport and Killed Officer Bettis, pull something out now on C.E.R.T. we will beat your Ass.'" (Doc. 1 at 5-6).

(Doc. 1 at 7-8).

Plaintiff is suing Alabama Department of Corrections Commissioner Jefferson Dunn and Associate Commissioner Grantt Culliver for assault and battery, excessive force, failure to protect, implementation of the procedures used, and Dental care, as they are responsible for overseeing the operations of Holman Correctional Facility ("Holman").

Plaintiff is suing Warden Cynthia Stewart, Warden Terry Raybon, Warden Phillip Mitchell,[4] Darryl Fails, Ashley Kidd, Officer Scarborough, Timothy Vignolo, Nathan McQuirter, Danny Fountain, Jermaine Bullard, Officer Smith, John Pryor, Jesse Stanford, Steve Terry, Dominic Whitley, David Dennis, James Griffin, Bradley Walker, Ernest Duren, William Streeter, Charles Arthur, Captain Jeffery Baldwin, Aaron Lewis, Demetrius Fleeton, Michael Harrison, Timothy Robinson, Samuel Snelson, Daryl Brown, Omar Parker, Jesse Wilson, DeJour Knight, Mallorie Mixon, Alfie Pacheco, Anthony Hadley, Harry Finklea, Antonio McClain, Larry McCovery, Marcus Gaston, Teddy Jones, Greggory Patterson, Terry Edwards, Corbin Tunstall, Clifton Sanders, Jasper Luitze, Jason Norris, and Cordaro Melton for assault and battery, excessive force, failure to protect or intervene, and denial of medical care.

Plaintiff also brings suit against Nurses Ashley Wall and Jonathan Langford for denial of medical care and inadequate treatment.

Plaintiff is suing each Defendant[5] for $150,000 in punitive damages and seeks declaratory and injunctive relief, a trial by jury for the alleged Eighth Amendment violations,

---

4      Plaintiff incorrectly identifies, in his complaint, Defendant Phillip Mitchell as "C. Mitchell".  (Doc. 1 at 12).
5      Plaintiff originally named as defendants in this action, Alabama Department of Corrections Emergency Response Team, Nurse 1, Nurse 2, Nurse 3, Nurse 4, and Cubicle Officer assigned to Cubicle 1. (Doc. 1). "As a general matter, fictitious party

as well as assault and battery.[6]  Plaintiff further seeks "any other relief as the law and this Court deem just."  (Doc. 1 at 18).

### B. Defendants' Answers and Special Reports.

The defendants have answered the suit denying in full the allegations against them and filed special reports in support of their positions.  (Docs. 89, 38, 39, 28, 29, 40, 41, 88, 122, 123, 126, 127, 141, 142, 153, 154).  As part of their special reports, Defendants have submitted pertinent prison documents which include the November 9, 2016 Incident Report, Use of Force Report, Duty Officer Report, I&I Investigative Report, disciplinary records, medical records, and defendant officers' affidavits.

The Incident Report provides details of the Nov. 9 search, as well as facts leading to the incident, stating:

> On November 7, 2016, the Southern CERT members entered B-Dormitory and ordered all inmates to remove sticks and tied up blankets from their beds.  The inmates refused to comply and became very hostile and aggressive toward the CERT members.  The inmates gathered in a threatening and intimidating manner around the CERT members stating, "This is 2016, and we run this, slavery is over with, we already done killed one of y'all." Several unidentified inmates were observed with handmade knives in their possession.  The CERT members were able to exit the

_____

pleading is not permitted in federal court." Richardson v. Johnson, 598 F.3d 734, 738 (11th Cir. 2010); see also CSX Transp., Inc. v. United Transp. Union, 236 F. App'x 562, 563 n.1 (11th Cir. 2007) ("the Federal Rules do not authorize suit against fictitious parties"), cert. denied, 552 U.S. 1243, 128 S. Ct. 1475, 170 L. Ed. 2d 297 (2008); Featherstone v. Home Oil Co., 2011 U.S. Dist. LEXIS 139102, 2011 WL 5978774, at *1 n.4 (S.D. Ala. Nov. 8, 2011) (subject to a limited exception, "fictitious party practice is not permitted in federal court").  Accordingly, these "parties" are not defendants in this suit.

[6]     In his requested relief, Plaintiff seeks to recover damages for "slander and harassment".  (Doc. 1 at 18).  In his complaint, Plaintiff makes the conclusory allegation the CERT Team members continued to harass inmates and look at them in an intimidating manner.  (Id. at 8).   However, the complaint is void of any specific facts necessary to establish such a claim, nor does Plaintiff causally connect any defendant to such actions in order to establish a claim, and neither does Plaintiff raise such claims in subsequent pleadings.  Accordingly, the undersigned deems these claims to be insufficiently plead and abandoned.

dormitory without incident. The inmates with handmade knives were later identified by the CERT members through IMAS. On November 9, 2016, at approximately 6:35 a.m., the North Central, South Central, and Southern Team CERT Teams entered B-Dormitory to arrest the suspects. . . . All inmates were given orders to report to their assigned beds, lie down, and place their hands behind their back. The following inmates failed to comply with the orders given:  . . . . The CERT Teams used force to include impact weapons and physical force on the above mentioned inmates to get them to comply with the orders given [].   The [noncompliant] inmates were arrested and escorted to the health care unit for medical assessments. . . .

(Doc. 29-1).  The CERT Team's Nov. 9 search resulted in the confiscation of thirty (30) handmade knives and eleven (11) inmates were charged with failure to obey a direct order of an ADOC employee and allowed to remain in population pending the disciplinary action, while twenty-one (21) inmates, were transferred to segregation pending disciplinary actions for failing to obey a direct order, gathering in a threatening or intimidating manner, and unauthorized possession of a weapon or device that could be used as a weapon (as these inmates were identified as participants in the Nov. 7 incident). (Id.).  Plaintiff is not included in either of these groups.

Relying on the Incident Report and factually similar Duty Officer Report (Doc. 29-3), Defendants contend that Plaintiff was not involved in the Nov. 7 incident; likewise, they contend that he was not involved in the Nov. 9 incident and deny that any force was used against him, specifically punches to the face.  Defendants further contend that Plaintiff was not taken to the health care unit because he was not a part of the incident and no force was used against him.  (Doc. 29 at 8-9).

Pointing to the medical records, Defendants assert that Plaintiff' did not suffer an injury nor was he denied medical care.  In short, Defendants contend that the alleged broken tooth complained of by Plaintiff was already decayed and broken prior to Nov. 9. Defendants further stress that Plaintiff had no swelling, bruising, or cuts to his facial area

to corroborate being hit or punched by the CERT Team when evaluated on November 11, 2016.  And, as to Plaintiff's complained of broken partial plate, Defendants claim Plaintiff "never had or qualified for a partial dental plate."  (Id. at 14).

The medical records reflect that Plaintiff was evaluated on October 26, 2016 for complaints of a "sharp tooth".  (Doc. 41-6 at 32).  The dentist assessed Plaintiff with a fractured crown on tooth #12 and scheduled removal of the tooth.  (Doc. 41-1 at 2) (The date for which Plaintiff was scheduled for a tooth extraction is void from the pleadings).

Following the Nov. 9 incident, the medical records reflect that Plaintiff submitted a sick call request slip complaining, "My teeth was knocked out by the CERT Team when they hit me in my face." (Doc. 89-18 at 5).  The request was received and reviewed by Nurse Gray on November 10, 2016 at 1:30 p.m., and she notified Officer Johnson to bring Plaintiff to the health care unit for evaluation at that time.  (Id. at 5, 9).  The records indicated that Plaintiff was first evaluated after the incident on November 11, 2016, when Nurse Wall saw him at 5:00 a.m. (Id. at 6).   The chart notes that Plaintiff's chief complaint was that, since Nov. 9, his tooth had been hurting, and he rated the pain as a three (3) on a scale of one to ten.  (Id.).  Nurse Wall indicated that there were no observable signs of trauma or injury to Plaintiff's jaw or face but noted visible evidence of tooth decay and fracture.  (Id.).  Nurse Wall also failed to make any notations in the sections of the form questioning whether there was a "Tooth knocked out?"  (Doc. 41-6 at 40).  The record includes a medication order on November 11, 2016 for Ibuprofen 200 mg, twice a day for 7 days. (Doc. 89-18 at 16-17). Review of the medication administration log indicates that Plaintiff received 1 dose of the pain medication on November 11, 2016, both doses the following day, was a no show for pill call the next two days, received a single dose on

November 15, 2016, and was a no show for his last two doses to be administered.  (Doc. 89-18 at 19).

On November 16, 2016, Plaintiff underwent a surgical procedure to extract his fractured tooth, #12.  (Doc. 41-1 at 3).  On November 30, 2016, Plaintiff submitted a sick call request slip complaining:

> On November 9, 2016 the ADOC (CERT) Team hit me in my mouth knocking my teeth out and my dental plate.  I need to see can I get a new plate.

(Doc. 89-18 at 7).  Plaintiff was again evaluated.  The nursing notes indicate that Plaintiff complained that his tooth was knocked out on Nov. 9 and about a week ago the remaining part of the tooth was pulled out.  (Doc. 41-6 at 37).  Plaintiff was prescribed pain medication and referred to the dentist.  (Id. at 38).

Plaintiff was again seen on December 6, 2016 with complaints that the riot team broke his last partial denture and he needed it replaced; however, Plaintiff was informed that because he was not missing at least 6 chewing teeth, he did not qualify for a new denture per ADOC.  (Id.).  The dental records also include a note, stating:

> Patient assertions of lost (or) damaged denture could not be verified anywhere in his records or prison records.

(Doc. 89-18 at 10).  The record indicates that, subsequent to the Nov. 9 incident, Plaintiff has not received a dental plate.

Beyond denying Plaintiff's allegations in their Special Report, Defendants argue that any use of force by officers was "justified as they were surrounded by more than thirty openly defiant and violent inmates who were threatening their lives and wielding 'knives and broom handles.'"  (Doc. 29 at 13).  Because any force used was applied in a good

faith effort to maintain or restore discipline, Defendants reason there can be no constitutional violation. (Id).

After review of the pleadings, the answers, special reports, and exhibits of the defendants were converted into a motion for summary judgment by the Court. (Docs. 139, 143, 155).

### C. Plaintiff's Objection to Defendants' Motion for Summary Judgment.

In his objection to the motion for summary judgment, Plaintiff reiterates his initial complaint and expounds on the details of the incident, namely identifying defendants and causally connecting defendants to allegedly liable actions.

Plaintiff claims that after the assaults, while some of the inmates were being escorted to the infirmary, some inmates were being "paraded by CERT Team Members around the dorm slapping and beating the inmates in front of the other inmates while other Cert Team Members laughed and shouted obscenity[ies] at the inmates." (Doc. 158 at 8). While Plaintiff was lying face down on his bed, with his hands zip tied behind his back, Captain Fails, Dominic Whitley, Harry Finklea, Demetrius Fleeton, and Akeem Edmonds approached his bed and instructed him to get up. As Plaintiff was "getting up," Fails and Finklea grabbed him by his arms and picked him up off the bed while Whitley hit him in the face twice with his fist, knocking one tooth loose and chipping another (that was subsequently extracted) and knocking his dental plate out of his mouth. (Id. at 8-9, 15). While lying on the floor, Plaintiff asked why he was being hit and states, "they kicked my plate up the floor and pick me up and threw me back on my bed" and laughed with other

CERT Team members, including Jesse Wilson, as they walked away.[7]  (Id. at 9; Doc. 158-1 at 2).

After the assaults, inmates were lined up and the plastic zip ties were removed from their wrists.  When Plaintiff's plastic cuffs were removed, he asked to go to the infirmary because he was hit in the jaw/face and his head was hurting.  However, Plaintiff was told to go back to his bed before he was hit in the face again.  After the CERT Team exited the dormitory, Plaintiff and several other inmates who had been beaten asked the Dorm Officer Vignolo if they could go to the infirmary to receive a body chart and treatment. Officer Vignolo radioed the infirmary, informed the infirmary that inmates alleging to have been beaten by the CERT Team were requesting treatment, and Plaintiff "heard Defendants Daryl Fails and Ashley Kidd come over Vignolo['s] radio and instruct him not to send anymore inmates to the infirmary, that they we needed to fill out a sick call request slip." (Doc. 158 at 9).[8]

On November 9, 2016, Plaintiff submitted a sick call request slip but claims he was not seen by the infirmary for several days, suffering pain in his face and the inability to eat for a few days.  When Plaintiff was evaluated in the health care unit, Nurses Walls, Langford, and Gray refused to document his "reason for coming" and failed to provide him with any treatment or pain medication for his face and jaw.  While Plaintiff admits his

---

[7]     Plaintiff also details that Defendants knocked his partial plate out and stomped and kicked it up the floor.  (Doc. 158 at 15).

[8]     In corroboration of his version of the events, Plaintiff submits the affidavits of Inmates Robert Patterson, Calvin Middleton, Jimmy Lang, Eddie John Campbell, Charles Austin, and John W. King.  (Doc. 158-1 at 5-13).  Some of the statements are sworn to under penalty of perjury and others appear to have been drafted with the intent of being notarized.  However, many of the statements have handwritten notations that "no notary was available" and each of these statements contains the signatures of three witnesses. (See id.).

tooth was subsequently extracted, he asserts his partial plate was never found and the dentist has refused to replace it because Plaintiff does not meet the necessary criteria to qualify, that being missing at least six teeth.  Plaintiff challenges Defendants' claim that he did not have a partial plate on Nov. 9 by declaring that review of his "complete (not partial)" dental records would evidence he previously received a partial dental plate while in the custody of the Alabama Department of Corrections.  (Id. at 24).

Plaintiff further challenges and "disagree[s] with all of the defendants['] theory of the incident."  (Id. at 14).  Plaintiff maintains that when the CERT Team entered B-Dorm on Nov. 9, at least 80 of the 114 inmates were asleep in their beds, and the CERT Team came in "hollering get on your bed and at the same time hitting and beating every inmate within their reach, . . . while assaulting the inmate they placed plastic restraint tyes on the inmates behind their back while the other Cert Members was parading up and down B-Unit [making harassing and threatening statements]."  (Id. at 14-15).  He reasons that most of the defendants were in a position to intervene by their presence in B-Dorm and questions the lack of specificity in the defendants' affidavit responses in describing their positions within the dorm on Nov. 9.

Lastly, Plaintiff clarifies that Defendants Dunn, Culliver, Stewart, Raybon, Mitchell, Fails, and Kidd are not being sued based on their supervisory positions but, rather, for their individual actions in violating Plaintiff's constitutional rights.  Plaintiff asserts that Dunn is responsible for the day-to-day operations of the prison facilities in Alabama and, thus, "was fully aware" of the CERT Team's entry into Holman and instructed the CERT Team on what to do and how to do it.  (Doc. 158 at 20).  Plaintiff asserts that Culliver, as Commander and Chief of the CERT Team, knew that the CERT Team was entering

Holman and "knew or should have known" that the CERT Team would use excessive force, based on previous incidents where the CERT Team has been sued for excessive force violations, and Plaintiff further asserts that Culliver "instructs [the CERT Team] to use such [force]".  (Id.).  Plaintiff declares that Dunn and Culliver have a "custom, policy and is personally involved in the Cert Teams actions."  (Id.).  As to Stewart, Raybon, Mitchell, and Kidd, Plaintiff contends that as the wardens and shift supervisors at Holman on Nov. 9, these defendants were aware of the CERT Team's intentions and plans of using force based on previous complaints "lodged . . . against the Cert Team for Excessive force, harassment, profanity, and other unprofessional actions."  (Id.).  Plaintiff claims that these defendants provided the CERT Team with the names and bed location of the prisoners and provided "the plans to ambush and assault Plaintiff and other prisoners while they were sleep and; or hogtied behind their back."  (Id.).  Plaintiff claims these defendants "knew or should have known that allowing the Cert Team to enter Holman at 6:30 am with guns and in full riot gear, under the circumstances of Holman Prison at the time, i.e., an Officer was recently killed, a Warden was stabbed, and numerous inmate on inmate assaults, officer on inmate assaults, riots and shutdowns, would cause harm to the inmates in violation of their constitutional rights."  (Id. at 21) (grammatical alterations).  Plaintiff specifically asserts that Defendant Kidd, as the shift supervisor on Nov. 9, instructed the CERT Team to enter B-Dorm at 6:30 a.m. (after inmates had eaten breakfast), knowing that most inmates would be asleep.  Plaintiff further claims that it was Kidd who assisted in identifying inmates through IMAS, provided photographs of inmate suspects, instructed some of her own officers to assist the CERT Team, and then later denied him medical attention.

11

In response to the denials of Nurses Langford and Wall, Plaintiff states following the incident, he "was told that" Nurses Langford and Wall were not seeing any more inmates and to sign up for sick call, causing him to suffer pain for several days before being evaluated.  Plaintiff reiterates that when he was seen in the health care unit, Nurses Wall, Langford, and Gray did not write down what he was telling them and failed to provide him pain medication, telling him instead that he would see the dentist.  (Id. at 24).

After a thorough review of the pleadings, including Plaintiff's objection to the motion for summary judgment, this motion is ripe for consideration.

## II.    Summary Judgment Standard.

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) ("[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.") (emphasis in original); Garczynski v. Bradshaw, 573 F.3d 1158, 1165 (11th Cir. 2009) ("[S]ummary judgment is appropriate even if 'some alleged factual dispute' between the parties remains, so long as there is 'no genuine issue of material fact.'") (emphasis in original) (citation omitted).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of

material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing or pointing out to the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Id. at 322-24.

> Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor.

ThyssenKrupp Steel USA, LLC v. United Forming, Inc., 926 F. Supp. 2d 1286, 1290 (S.D. Ala. 2013) (internal citations omitted).

The requirement to view the facts in favor of the nonmoving party extends only to "genuine" disputes over material facts. Garczynski, 573 F.3d at 1165. "A genuine dispute requires more than 'some metaphysical doubt as to material facts.'" Id. (citations omitted). A "mere scintilla" of evidence is insufficient; the nonmoving party must produce substantial evidence in order to defeat a motion for summary judgment. Id. In addition, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995). More importantly, where "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007); see also Logan v. Smith,

439 F. App'x 798, 800 (11th Cir. 2011) ("In cases where opposing parties tell different versions of the same events, one of which is blatantly contradicted by the record—such that no reasonable jury could believe it—a court should not adopt the contradicted allegations.").

### III. Analysis.

#### A. Immunity Defenses.

To the extent Plaintiff is proceeding against the correctional officer defendants in their official capacities, those claims fail. The Eleventh Amendment, which specifically prohibits suits against "the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State," has long been held to apply "equally to suits against a state brought in federal court by citizens of that state." Harbert Int'l, Inc. v. James, 157 F.3d 1271, 1277 (11th Cir. 1998). "The state need not be formally named as a defendant for the amendment to apply; state officials sued in their official capacity are also protected by the amendment." Id. (citing Kentucky v. Graham, 473 U.S. 159, 166-67, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985)). Accordingly, the correctional officer defendants in this action, all of whom were employed by the State of Alabama Department of Corrections at the time of the incidents alleged in the complaint, are immune from suit in their official capacities. See Parker v. Williams, 862 F.2d 1471, 1476 n.4 (11th Cir. 1989), overruled on other grounds in Turquitt v. Jefferson Cnty., 137 F.3d 1285 (11th Cir. 1998) ("[S]uits against an official in his or her official capacity are suits against the entity the individual represents."). Thus, the officer defendants, in their official capacities, are entitled to summary judgment as a matter of law.

"Qualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Dalrymple v. Reno, 334 F.3d 991, 994 (11th Cir. 2003) (quoting Hope v. Pelzer, 536 U.S. 730, 739, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002)).  While there is no doubt that the defendants in this action were acting within their discretionary authority at all times when the acts in question occurred, the Eleventh Circuit has made clear that the defense of qualified immunity "is not available in cases alleging excessive force in violation of the Eighth Amendment, because the use of force 'maliciously and sadistically to cause harm' is clearly established to be a violation of the Constitution by the Supreme Court decisions in Hudson and Whitley." Skrtich v. Thornton, 280 F.3d 1295, 1301 (11th Cir. 2002) (citation omitted).  As to the remaining claims, officer defendants are entitled to qualified immunity unless Plaintiff can show that their conduct violated a clearly established statutory or constitutional right of which a reasonable person would have known. See Belcher v. City of Foley, Ala., 30 F.3d 1390, 1395 (11th Cir. 1994). Therefore, the Court will now address whether this action identifies any constitutional violation.

### B.  Claims Under 42 U.S.C. § 1983.

Plaintiff proceeds pursuant to 42 U.S.C. § 1983.  "In order for a plaintiff to establish a claim under 42 U.S.C. § 1983, he must prove (1) a violation of a constitutional right, and (2) that the alleged violation was committed by a person acting under the color of state law." Martinez v. Burns, 459 F. App'x 849, 850-851 (11th Cir. 2012) (citing Holmes v. Crosby, 418 F.3d 1256, 1258 (11th Cir. 2005)).  There is no dispute that the named

defendants, as employees of the Alabama Department of Corrections and its contracted medical provider, are state actors for purposes of this action. Thus, to establish his asserted claims, Plaintiff must establish that the named defendants, personally, acted to deprive him of a constitutional right.

The Court will now address Plaintiff's claims in turn.

### 1. Excessive Force.

While Plaintiff has broadly asserted claims of excessive force against most of the defendants in this action, review of his pleadings narrows his claim by the identification of specific defendants, namely Defendants Whitley, Fails, Finklea, Fleeton, and Edmonds. He further asserts allegations of excessive force against Defendants Dunn, Culliver, Stewart, Raybon, Mitchell, and Kidd.

The Eighth Amendment's prohibition against cruel and unusual punishment, U.S. Const. amend. VIII, governs the use of force by prison officials against convicted inmates. Campbell v. Sikes, 169 F.3d 1353, 1374 (11th Cir. 1999). In order to establish an Eighth Amendment excessive force claim against the defendants, Plaintiff must prove both an objective and subjective component. That is, he must show that the alleged wrongdoing was objectively "harmful enough" to establish a constitutional violation and that the defendants "act[ed] with a sufficiently culpable state of mind; i.e., that they acted maliciously and sadistically to cause harm." Hudson v. McMillian, 503 U.S. 1, 7, 112 S. Ct. 995, 999, 117 L. Ed. 2d 156 (1992) (citations omitted); see also Lumley v. City of Dade City, Fla., 327 F.3d 1186, 1196 (11th Cir. 2003) (to satisfy the objective conduct, the plaintiff must show the complained of conduct "shocks the conscience"). Both inquiries are contextual, and "the objective harm inquiry is responsive to contemporary standards."

Thomas v. Bryant, 614 F.3d 1288, 1304 (11th Cir. 2010).  While not every "malevolent touch" by a prison guard amounts to excessive force, a de minimis use of force is cognizable under the Eighth Amendment if it is "repugnant to the conscience of mankind." See Wilkins v. Gaddy, 559 U.S. 34, 37-38, 130 S. Ct. 1175, 175 L. Ed. 2d 995 (2010) (quotation marks omitted).

"[W]here a prison security measure is undertaken to resolve a disturbance . . . that indisputably poses significant risks to the safety of inmates and prison staff, . . . the question of whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on whether the force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." Whitley, 475 U.S. at 320-21; see also Skrtich v. Thornton, 280 F.3d 1295, 1300 (11th Cir. 2002). Factors relevant to this determination include the "need for the application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response." Skrtich, 280 F.3d at 1300.  The absence of injury is one factor to be considered in determine whether or not force used was conceivably necessary and may indicate the amount of force used.  Wilkins, 559 U.S. at 37.  Once the need for force ceases, any continued force applied can constitute an Eighth Amendment violation.  Williams v. Burton, 943 F.2d 1572, 1576 (11th Cir. 1991).  When considering these factors, courts afford "a wide range of deference to prison officials acting to preserve discipline and security, including when considering decisions made at the scene of a disturbance."  Fennell v. Gilstrap, 559 F. 3d 1212, 1217 (11th Cir. 2009) (quotation marks omitted).

###### i.      CERT Team Defendants.

Plaintiff alleges that while lying face down on his bed, hands cuffed behind his back, compliant, and not resisting, Defendants Fails, Finklea, Fleeton and/or Edmonds ordered him to stand and he attempted to comply. At which time, however, Defendants Fails and Finklea grabbed him by the arms and pulled him up and Defendant Whitley punched him in the face with his fist, twice.  The blows knocked out Plaintiff's tooth and dental plate, and the defendants stomped his dental plate, kicked it up the floor, and threw him back on his bed – all while laughing.  Defendants wholly deny these allegations and insist that Plaintiff was not involved in the Nov. 9 incident.  In support of their denials, they have submitted affidavits in response to this suit; their statements are summarized as follows:

Defendant Dominic Whitley affirms that he did not use force against Plaintiff.  (Doc. 29-11).

Defendant Daryl Fails affirms that while he was present when the CERT Team entered B-Dorm, he existed the dorm and returned to his office because the CERT Team Commanders were in control.  (Doc. 29-5).  He further affirms that while in B-Dorm, he did not observe any member assault an inmate or use excessive force.  (Id.).

Defendants Harry Finklea and Jesse Wilson affirm that they did not use or see force used on Plaintiff.  (Docs. 89-5; 29-14).

Defendants Akeem Edmonds and Demetrives Fleeton affirm that they did not observe any abuse, assault, or excessive force used in B-Dorm on Nov. 9.  (Docs. 89-4; 89-6).

When Defendants' versions of the event are compared to Plaintiff's, it is obvious that the parties have presented two distinctly different versions of the facts.  The law is clear, at the summary judgment stage, courts are required to draw all reasonable inferences in favor of the nonmoving party at the summary judgment stage; those inferences, however, must be based on facts in the record,  Cordoba v. Dillard's, Inc., 419 F.3d 1169, 1181 (11th Cir. 2005), and Defendants assert that Plaintiff's claims are

contradicted by the medical record and support that excessive force was not applied to Plaintiff.  First, Defendants contend that no body chart exists for Plaintiff following the Nov. 9 incident and reason that this proves force was not used on Plaintiff.  Second, Defendants contend that the tooth Plaintiff complained of when seen, following the Nov. 9 incident on November 11, 2016, was a tooth that previously caused him problems and that he had no visible signs of injury to his face.  Third, Defendants contend that the medical records indicate that Plaintiff did not possess a dental plate on Nov. 9 as he alleges.

If these medical records were unchallenged, then the undersigned would almost surely conclude, as Defendants argue, that Plaintiff's allegations are implausible. Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").  However, that is not the case here.  Instead, Plaintiff specifically claims he was denied a body chart or medical attention, by multiple defendants, following the Nov. 9 incident, despite requesting multiple times to be taken to the medical unit.  As to Defendants' denial that Plaintiff ever possessed a dental plate, the submitted medical records evidence that approximately a year prior to the Nov. 9 incident, on December 16, 2015, Plaintiff submitted a sick call request that his "Dental Plate Needs Updated."  (Doc. 41-6 at 22). Such a request surely weighs in support of Plaintiff's claim that he possessed a dental plate at the time of the incident and could further support a reasonable jury's determination of the same.  Furthermore, the undersigned finds Plaintiff's preexisting tooth problems do not contradict Plaintiff's

19

allegations that on Nov. 9, a tooth was knocked out and a currently decaying tooth was hit, chipped, loosened, or broken further. Thus, "the medical records here are not the same as the 'incontrovertible' video evidence that courts must accept over contradictory sworn statements, since those records involve people and all their attendant mental infirmities, biases, and limitations-in their creation." Sears v. Warden Okeechobee Corr. Inst., 762 F. App'x 910, 917 (11th Cir. 2019).  Accordingly, reliance on such contested records would be inappropriate and against the required legal standard for summary judgment to weigh all evidence and factual inferences in the light most favorable to the nonmovant, Plaintiff, Kingsland v. City of Miami, 382 F.3d 1220, 1226 (11th Cir. 2004), as there is a big difference between the incontrovertible video evidence presented in Scott and the evidence submitted here.[9]  Sears v. Roberts, 922 F.3d 1199, 1208 (11th Cir. 2019).  The defendants' proffered evidence of personal affidavits, incident reports, officer duty reports, disciplinary reports and other similar documents falls short of establishing "incontrovertible" evidence.  Consequently, the record before the court lacks incontrovertible objective evidence rendering Plaintiff's account implausible.  Id.  At the summary judgment stage of the case, conflicting evidence must be resolved in favor of the nonmovant, Plaintiff.

Therefore, the record before the Court currently consists of dueling affidavits from Plaintiff and the defendants, creating a genuine issue of material fact of whether or not excessive force was used against Plaintiff.  Kingsland v. City of Miami, 382 F.3d 1220, 1225-26 (11th Cir. 2004); see also United States v. Stein, 881F.3d 853, 858-59 (11th Cir.

---

[9]     In the case at hand, Defendants rely on the affidavits of CERT team members, Incident Reports, medical records, and other prison records.

2018) (Rule 56 does not require that "an otherwise admissible affidavit be corroborated by independent evidence") (en banc).

> The question on summary judgment is not about which side has offered the most evidence. Instead, that question is simply whether there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249, 106 S. Ct. at 2511. While a plaintiff "may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial," id. at 248, 106 S. Ct. at 2510 (quotation marks and alterations omitted), we have long recognized that "[c]ourts routinely and properly deny summary judgment on the basis of a party's sworn testimony," Price v. Time, Inc., 416 F.3d 1327, 1345 (11th Cir. 2005).

Sears v. Roberts, 922 F.3d at 1207-08.  "Summary judgment is not a time for fact-finding; that task is reserved for trial."  Sconiers v. Lockhart, 2020 U.S. App. LEXIS 292, *10 (11th Cir. Jan. 7, 2020).  The competing narratives present an issue of credibility, thus a factual issue, and the Court may not grant summary judgment.  Id. (citing Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742-43 (11th Cir. 1996).  Accordingly, the undersigned finds that Plaintiff has carried his burden of overcoming summary judgment, and it will be Plaintiff's burden to bear at trial to prove his allegations that, while following all orders, not resisting, and restrained, Defendant Whitley hit him in the face twice knocking out his tooth and dental plate.  Consequently, it is recommended that summary judgment be **DENIED** as to **Defendants Whitley, Fails, Finklea, Fleeton, and Edmonds.**

As to the remaining CERT Team Defendants, Plaintiff has put forth no allegations connecting their actions to the alleged unconstitutional violation and based on their personal affidavits, the undersigned finds no connection. [10]  Accordingly, it is

---

[10]     The following defendants affirm that they were not present in B-Dorm at the time of the incident subject of this complaint: Mallory Mixon (Doc. 122-5), Otis Smith (Doc. 122-8), Timothy Vignolo (Doc. 29-23).

recommended that summary judgment be **GRANTED** in favor of the **remaining CERT Team defendants** on the claim of excessive force.

### ii.    Supervisory Officials.

Plaintiff further claims that supervisory Defendants Dunn, Culliver, Stewart, Raybon, Mitchell, and Kidd are liable for any excessive force used against him.  "It is well established in this Circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of *respondeat superior* or vicarious liability." Hartley v. Parnell, 193 F.3d 1263, 1269 (11th Cir. 1999) (internal quotation marks and citation omitted).  If a supervisor's liability cannot be established based on the supervisor's personal participation in the complained acts, a plaintiff must show a causal connection between the supervisor's actions and the alleged constitutional deprivation. Brown v. Crawford, 906 F.2d 667, 671 (11th Cir. 1990).

> A causal connection may be established when: 1) a "history of widespread abuse" puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so; 2)  a supervisor's custom or policy results in deliberate indifference to constitutional rights; or 3) facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so.

---

The following defendants do not address the force used against Plaintiff: Jeffrey Baldwin (Doc. 89-2), Daryl Brown (Doc. 89-3).

The following defendants deny observing any abuse, assault, or excessive force used against Plaintiff: Akeem Edmonds (Doc. 89-4), Demetrives Fleeton (Doc. 89-6), Aaron Lewis (Doc. 89-8), Cordaro Melton (Doc. 122-7), Timothy Robinson (Doc. 89-16), Clifton Sanders (Doc. 122-6), Corbin Tunstall (Doc. 122-4).

The following defendants did not use or see any force used on Plaintiff: Charles Arthur (Doc. 29-21), Jermaine Bullard (Doc. 29-16), Earnest Duren (Doc. 29-24), Harry Finklea (Doc. 89-5), Danny Fountain (Doc. 29-18), Anthony Hadley (Doc. 89-7), DeJour Knight (Doc. 29-9), Nathan McQuirter (Doc. 29-17), Alfie Pacheco (Doc. 89-13), William Streeter (Doc. 29-19), Jesse Wilson (Doc. 29-14).

Valdes v. Crosby, 450 F.3d 1231, 1237 (11th Cir. 2006) (citing Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003)).  A custom is established by showing "a longstanding and widespread practice [such that it] is deemed authorized by the policymaking officials because they must have known about it but failed to stop it."  Brown v. City of Fort Lauderdale, 923 F.2d 1474, 1481 (11th Cir. 1991) (A custom requires showing a practice so settled and permanent that it takes on the force of law).  "The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences."  West Tillman, 496 F.3d 1321, 1329 (11th Cir. 2007) (quotation marks and citations omitted).

The supervisory defendants have submitted affidavits denying Plaintiff's allegations asserted against them; the pertinent portions of their statements are summarized as follows:

Defendant Jefferson Dunn declares "I have no personal knowledge of the matters alleged in his Complaint.  I was not at Holman. . . . As Commissioner, I did not handle the day-to-day operations at Holman . . nor do I directly oversee the CERT."  (Doc. 89-1).

Defendant Grantt Culliver declares that he "was not at Holman CF on this date I cannot state whether this action occurred or not.  The actions listed by inmate Griggs were not reported to me by the CERT Commander or the Warden of the facility.  The actions described by inmate Griggs of the events on November 9, 2016, are not characteristic of CERT procedures.  It is not the manner in which the team is trained, and I have never witnessed the team proceed in this manner."  (Doc. 89-18 at 1-3).

Defendants Stewart and Mitchell declare that the CERT Team was under direction of the CERT Coordinator and/or Team Commander to "accomplish the goals with absolute minimum force, while seeking positive resolution of the events."  (Docs. 29-20; 29-4).

Defendant Raybon declares he did not arrive at Holman until 8 a.m., after the time of the alleged events subject of this action.  (Doc. 29-13).

Defendant Kidd was the Shift Commander at the time of the incident subject of the complaint but was not present in B-Dorm when the CERT Team entered, as she was

assisting with the institutional shakedown of female employees entering the facility and supervising the institutional count. (Doc. 29-22).

In this action, the record is void of sufficient facts or suggestions that these named defendants personally participated in the Nov. 9 incident or were present in B-dorm during the incident on Nov. 9.  In Plaintiff's attempt to connect the defendants' actions (or inaction) causally to the alleged excessive force used against him, Plaintiff pleads that on Nov. 9 the CERT Team had previous complaints filed against them for excessive force, harassment, and other unprofessional actions. He pleads that such actions are sanctioned by Culliver and known to Dunn.  Plaintiff contends that the supervisory defendants had knowledge of the current, violent atmosphere at Holman on Nov. 9 and reasons that the CERT Team's entry into a sleeping B-Dorm, with guns and riot gear, suggests that unconstitutional force would be used against the inmates on Nov. 9, of which the supervisory defendants were aware.

These factual allegations lack specificity and fall short of stating a plausible claim, to all but Defendant Culliver.  Under Iqbal, "conclusory allegations . . . legal conclusions without adequate factual support are entitled to no assumption of truth."  Mamani v. Berzain, 654 F.3d 1148, 1153 (11th Cir. 2011) (citing Ashcroft v. Iqbal, 556 U.S. 662, 679, 127 S. Ct. 1937, 173 L. Ed 2d 868 (2009).   The record reveals that Defendant Dunn is not involved in the daily operations of Holman nor does he oversee the CERT Team, and Plaintiff provides no evidence to dispute the same.  Plaintiff's contention that the supervisors at Holman are liable for unconstitutional force because they provided the CERT Team with the names and bed location of the prisoners to be arrested is far too tenuous. Likewise, their knowledge or planning of the CERT Team's entry into a sleeping B-Dorm is simply insufficient to causally connect them to the alleged force used –

arguably, such planning and entry could just as reasonably suggest an intent to limit the amount of force used versus encouraging it. Furthermore, Plaintiff, at this time, fails to allege facts to evidence or demonstrate that the type of force utilized by the CERT Team and the actions described in his complaint are commonplace or standard practice by the CERT Team or known to the supervising Defendants.

As to Defendant Culliver, Plaintiff asserts that, as the Commander and Chief of the CERT Team, he knew that the CERT Team was entering Holman and "knew or should have known" that the CERT Team would use excessive force on inmates, based on previous incidents where the CERT Team has been sued for excessive force violations, and Plaintiff further asserts that Culliver instructs the CERT Team to use such force. These allegations alone are conclusory and fall short of connecting Defendant Culliver to the Nov. 9 incident.  However, Plaintiff goes further and describes the reigning violence at Holman prior to the Nov. 9 incident (including the killing of an officer, stabbing of a warden, and documented inmate attacks) and provides examples of the statements shouted by the CERT Team during the incident (which reference the rising violence and inmate control at Holman and clearly imply that the officers are to be viewed as the ones in control of Holman, not the inmates) to evidence that the CERT Team entered with the purpose of regaining control of B-Dorm.  With those facts, a reasonable jury could find support that Defendant Culliver, as the commander of the CERT Team, knew and/or directed excessive force to be used on Nov. 9.  Accordingly, this becomes a question for the jury and is not properly resolved on summary judgment.

Consequently, Plaintiff has failed to state a cause of action against **Defendants Dunn, Stewart, Raybon, Kidd, and Mitchell**, at this time, and summary judgment should be **GRANTED** in their favor on the claim of excessive force but **DENIED** as to **Culliver**.

## 2.  Failure to Protect.

A prison official violates the Eighth Amendment when he or she acts with deliberate indifference to a substantial risk of serious harm to an inmate. Farmer v. Brennan, 511 U.S. 825, 828, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994).  "An officer who is present at the scene [of an altercation] and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held liable for his nonfeasance." Hadley v. Gutierrez, 526 F.3d 1324, 1330 (11th Cir. 2008).  But, an officer may only be liable for failing to protect if the officer was in a position to intervene yet failed to do so.  Priester v. City of Riviera Beach, Fla., 208 F.3d 919, 924 (11th Cir. 2000).  As previously discussed, it is unclear at this time whether excessive force was used against Plaintiff on November 9, 2016.  Similarly, it cannot be determined from the sparse affidavit responses of the CERT Team defendants what each observed or his position in relation to Plaintiff to determine if the defendant was reasonably able to protect Plaintiff.

Plaintiff has alleged a failure to protect claim against Dunn, Culliver, Stewart, Raybon, Mitchell, Fails, Kidd, Scarbrough, Vignolo, and all members of the CERT team named in the lawsuit.

The record evidences that Defendants Dunn, Culliver, Stewart, Raybon, Mitchell, Fails, Kidd, Scarbrough, and Vignolo were not present in B-Dorm at the time of the incident, and Plaintiff has failed to plead any facts indicating otherwise.  Plaintiff has further failed to allege a causal connection between an action of the named supervisor

and the alleged excessive force used, except as to Defendant Culliver, as previously discussed.   Without personal participation or a causal connection between the supervisor's action and the alleged constitutional deprivation, there can be no liability under § 1983.  See Hartley, 193 F.3d at 1269; Brown, 906 F.2d at 671.  Accordingly, **Defendants Dunn, Stewart, Raybon, Mitchell, Kidd, Scarbrough, and Vignolo** cannot be liable for failing to protect Plaintiff and summary judgment should be **GRANTED** in their favor.  However, summary judgment should be **DENIED** as to Defendant Culliver at this time, as Plaintiff has put forth facts (as previously discussed) that Defendant Culliver is the Commander of the CERT Team; Defendant Culliver was aware of the rising problems at Holman, particularly the violence of inmates on officers, and claims that Culliver knew the actions and plans of the CERT Team to enter and use excessive force on the inmates in B-Dorm, and failed to stop them.  A reasonable jury could find these facts evidence that Defendant Culliver knew Plaintiff was at a risk of serious harm and failed to protect him.

The undersigned turns now to the allegations asserted against the CERT team defendants and Defendant Fails.  Based on Plaintiff's pleadings, Defendants Whitley, Fails, Finklea, Fleeton, or Edmonds  may have been in a position to intervene or protect Plaintiff from the alleged use of force.[11]   See Farmer, 511 U.S. at 837-38 (The Eighth Amendment does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual

---

[11]     Plaintiff broadly alleges that any CERT Team member in B-Dorm may have been in a position to intervene and stop the alleged force used against the B-Dorm inmates. However, as to the force used against Plaintiff, the timeline of the incident appears to be short in duration and participation confined to the identified defendants.  Accordingly, the undersigned limits its analysis to the identified, participating CERT Team members, Defendants Fails, Finklea, Fleeton, Edmonds, and Whitley.

'punishments.' . . . [A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment."). As alleged in the complaint and due to the conflicting affidavits of the parties, it is a question of fact as to what the defendants perceived as a risk to Plaintiff. Id. at 838 ("Proof that the defendant should have perceived the risk, but did not, is insufficient."). Accordingly, this is a genuine issue of a material fact that must be determined by a trier of fact and may not be decided on summary judgment. Consequently, summary judgment is **DENIED** as to **Defendants Whitley, Fails, Finklea, Fleeton, Edmonds, and Culliver**.

### 3. Denial of Medical Care.

Plaintiff claims that he was denied medical attention following the assault on Nov. 9 from Fails, Finklea, Fleeton, Edmonds, and Whitley when they threw him back on his bed in pain, instead of taking him to the health care unit. (Doc. 158 at 24). He claims:

> I was laying there with my teeth hurting. [Face swollen] I was scared to get up until I heard they was gone.

(Doc. 158-1 at 2). Following the CERT Team's exit of the dormitory, he, and several other inmates, asked Defendant Vignolo if they could go to the infirmary to get a body chart. When Vignolo radioed in the request to the infirmary "that he had inmates who stated they were beaten by the Cert Team and needed treatment", Daryl Fails and Ashley Kidd answered over the radio and instructed Vignolo not to send any more inmates to the infirmary, and the inmates were instructed to fill out sick call request slips. Plaintiff submitted a sick call request but claims he was not evaluated for several days, suffering

pain and the inability to eat, and was denied pain medication and replacement of his dental plate once he was seen by Wall.[12]

The Eighth Amendment prohibits indifference to a convicted prisoner's serious medical needs so deliberate that it "constitutes the unnecessary and wanton infliction of pain." Estelle v. Gamble, 429 U.S. 97, 104, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976). "To prevail on a claim of deliberate indifference, a plaintiff must show: (1) a serious medical need; (2) defendant's deliberate indifference to that need; and (3) causation between the defendant's indifference and the plaintiff's injury." McDaniels v. Lee, 405 F. App'x 456, 458 (11th Cir. 2010) (citing Mann v. TaserInt'l, Inc., 588 F.3d 1291, 1306-07 (11th Cir. 2009)).  To satisfy the first objective element, Plaintiff must prove his condition was, in fact, a serious medical need.  "A 'serious medical need' is one that is diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would recognize the need for medical treatment." Pourmoghani-Esfahani v. Gee, 625 F.3d 1313, 1317 (11th Cir.2010) (internal quotations omitted).  "To satisfy the subjective element of [a] deliberate indifference [claim, a] . . . Plaintiff must prove three subparts: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence." Bozeman v. Orum, 422 F.3d 1265, 1272 (11th Cir. 2005) (internal quotations omitted) (noting that subjective knowledge requires that defendant "'must *both* be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and* [ ] must also draw the inference'") (quoting

---

[12]    In his objection to this motion, Plaintiff claims the nurses did not give him "anything for the pain. But just told me that I would be put on the dentist list."  (Doc. 158-1 at 3).

Farmer v. Brennan, 511 U.S. 825, 837, 114 S. Ct. 1970, 128 L. Ed. 2d 811, (1994)); see also Townsend v. Jefferson Cnty., 601 F.3d 1152, 1158 (11th Cir. 2010).

As to Plaintiff's claims against Defendants Wall and Langford, the record belies the allegations that they were deliberately indifferent to his medical needs.  Notably, Plaintiff fails to show that the medical treatment he received was so grossly inadequate "as to amount to no care at all."  McElligott v. Foley, 182 F.3d 1248, 1257 (11th Cir. 1999) ("A core principle of Eighth Amendment jurisprudence in the area of medical care is that prison officials with knowledge of the need for care may not, by failing to provide care, delaying care, or providing grossly inadequate care, cause a prisoner to needlessly suffer the pain resulting from his or her illness.").

In this action, the record reflects that the medical staff promptly acted and treated Plaintiff upon knowledge of his complaints.  The record shows the medical staff was first alerted to Plaintiff's need for medical care through his sick call request complaining the CERT Team hit him in the face, knocking his teeth out.[13]  (Doc. 41-6 at 42).   The record further reflects that Plaintiff was fully evaluated on November 11, 2016, when Nurse Wall saw him early in the morning.  (Id. at 40).  Nurse Wall notes that Plaintiff's complaint of "throbbing" tooth pain started on Nov. 9 and that he had not had this pain before.  (Id.).  She further indicated he was having "difficulty chewing" and had visible signs of a tooth fracture and decay.  Where the dental form questions "Evidence of trauma/injury to jaw/face", the box is checked and then crossed through.  (Id.).  In her handwritten assessment, Nurse Wall refers Plaintiff to the dentist, prescribes him 400 mg of Ibuprofen

---

[13]     Plaintiff claims he filled out a sick call request the next day and was seen by the screening nurse.  (Doc. 158-1 at 2-3).

twice a day for a week, and indicates observing no edema or broken skin to Plaintiff's face or lips.  (Id. at 41).  The medication administration log reveals that Plaintiff, thereafter, was offered 200 mg Ibuprofen twice a day for a week, at pill call.  (See Docs. 41-6 at 25-26, 41).  Plaintiff was then referred to the dentist and underwent a tooth extraction.

Accordingly, ample evidence exists showing that Nurse Wall provided appropriate medical care to Plaintiff, including medication for pain relief and immediate referral to a dentist.[14]  There is no evidence that Nurse Wall or Langford refused to see Plaintiff on Nov. 9 knowing his injuries.  Instead, based on Plaintiff's allegations, Defendants Fail and Kidd stated that no more inmates were to be taken to the health care unit.  Furthermore, the fact that Nurse Wall failed to write down Plaintiff's statements on Nov. 11,  that the CERT Team knocked his tooth out, is irrelevant to this analysis - given that Nurse Wall did note that his tooth pain first began on Nov. 9, and his sick call request includes the complaint against the CERT Team.  See Whitley, 475 U.S. at 319 ("It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishment Clause.") Waldrop v. Evans, 871 F.2d 1030, 1035 (11th Cir. 1989) (When an inmate has received medical care, courts are reluctant to find deliberate indifference.). Notably, the cause of the tooth pain is immaterial and unrelated to whether or not Nurse Wall was deliberately indifferent to his medial need

---

[14]    The record evidence refutes Plaintiff's allegation that he did not receive pain medication from Nurse Wall.  The computer-generated order for Ibuprofen, coupled with the medication administration log, belies Plaintiff's claim.  Accordingly, these medical records (unlike simple chart notations) are more akin to the video evidence presented and relied upon in Scott, 550 U.S. at 380, as these records (without manipulation or tampering) do not involve people and their subjective biases or opinions.  Sears v. Warden Okeechobee Corr. Inst., 762 F. App'x 910, 917 (11th Cir. 2019).  Therefore, with no dispute or objection put forth by Plaintiff, the undersigned views such records as objective uncontroverted evidence.

or provided inadequate treatment. Lastly, Plaintiff's claim that his dental plate has not been replaced is not causally connected to Defendants Wall or Langford.  The record is void of any indication, and Plaintiff provides none, that Defendants Wall or Langford have any responsibility in personally providing dental services, care, or treatment.

Thus, the record indicates that neither Nurse Wall nor Nurse Langford (against whom Plaintiff asserts no specific allegations and the medical record confirms never evaluated or treated Plaintiff) was deliberately indifferent to a serious medical need of Plaintiff, nor did Nurse Wall or Langford provide inadequate medical care to Plaintiff.[15]  It is therefore recommended that summary judgment be **GRANTED** in favor of **Defendants Wall and Langford**.

The Court turns now to Plaintiff's claim against Defendants Whitley, Fails, Finklea, Fleeton, Edmond, and Kidd.  In order for Plaintiff to establish deliberate indifference, he

---

[15]     There is furthermore no constitutional violation due to any delay in receipt of his dental surgery or dental plate.  Plaintiff does not allege, and the record does not reflect, that his condition worsened over the week that he waited to have his tooth extracted.  Shapley v. Nevada Bd. of State Prison Comm'rs., 766 F.2d 404, 407 (9th Cir. 1985) (noting that where there is a "'mere delay in surgery,' a prisoner can make 'no claim for deliberate medical indifference unless the denial was harmful.'") (citation omitted).  Specifically, the record confirms that during the period of time between the altercation and when Plaintiff was taken to the health care unit, the medical defendants were unaware of his medical needs.  During the time lapse between his evaluation by Nurse Wall and his tooth extraction, Plaintiff was prescribed pain medication.  Furthermore, there is no indication that the named medical defendants are in any way responsible for any delay in the extraction of tooth #12.

Accordingly, Plaintiff has failed to produce supporting evidence that any "delays" in the receipt of medical treatment worsened his conditions or were caused by nonmedical reasons. As such, Plaintiff may not proceed on his medical deliberate indifference claim, and Defendants Wall and Langford are entitled to summary judgment on the deliberate indifference claim.

must allege facts sufficient to show "an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need, and an actual inference of required action from those facts."  Taylor v. Adams, 221 F.3d 1254, 1258 (11th Cir. 2000), cert. denied, 531 U.S. 1077, 121 S. Ct. 774, 148 L. Ed. 2d 673 (2001).

Defendants contend Plaintiff has failed to allege an objectively serious medical need or that officers were deliberately indifferent to that need, most because they flatly deny that any force was used on Plaintiff.  On the other hand, Plaintiff pleads he suffered pain in his teeth, jaw and head, a broken tooth, swelling, and the inability to eat.  Given that Plaintiff fails to allege suffering obvious injury to his face from being hit, including cuts, bruising, or bleeding, and the medical records evidence none, it's arguable that a reasonable jury could find Plaintiff did not suffer a serious medical need or that Defendants were not subjectively aware of a serious medical need.  On the other hand, a reasonable jury could determine from the facts that Plaintiff was hit in the face, hard enough to knock out a tooth and his dental plate, and such facts support that Defendants knew there was damage to Plaintiff's mouth/teeth that could be considered a serious medical need.

Whether a medical need is objectively serious is a factual finding.  Jones v. Minn. Dep't of Corr., 512 F.3d 478, 481 (8th Cir. 2008).  The Eleventh Circuit has determined that in some "circumstances, the need for dental care combined with the effects of not receiving it may give rise to a sufficiently serious medical need", id. at 1244, as can severe pain that is not promptly or adequately treated.  McElligott v. Foley, 182 F.3d 1248, 1255-59 (11th Cir. 1999).  In this action, the record evidence shows that once Plaintiff received medical attention, he required pain medication and surgical extraction of a tooth

(which was done in less than a week).  Plaintiff has also alleged that he was in pain and had swelling.[16]  Such facts, taken as true, evidence that Plaintiff was suffering from injuries that were not only painful but would have posed risks of infection and worsening problems if left untreated.  Farrow, 320 F.3d at 1243 (A medical need is deemed serious "if left unattended, [it] poses a substantial risk of serious harm.").   Also, Plaintiff alleges the injuries affected his daily activities, including his inability to eat.  Accordingly, at this point, there is a genuine dispute of fact as to whether Plaintiff's dental need was a serious medical need. This is a triable issue of a material fact and summary judgment should be denied as to the Eighth Amendment claim against Defendants Whitley, Fails, Finklea, Fleeton, Edmonds, and Kidd.  See Cooper v. Casey, 97 F.3d 914 (7th Cir. 1996) (Where two inmates were assaulted by prison guards and suffered cuts and severe muscular pain and did not receive medical assistance until the second day after the beating, Chief Judge Posner held that the issue of whether the plaintiffs were in sufficient pain to entitle them to pain medication within the first 48 hours after the beating was properly an issue for the jury.); see also Berry v. Petterman, 604 F.3d 435, 440 (7th Cir. 2010) ("Tooth decay can constitute an objectively serious medical condition because of pain and the risk of infection").  Whether the hits to Plaintiff's face and sustained tooth/mouth injury inflicted sufficient pain to entitle him to immediate pain medication on Nov. 9 is a factual question; thus, an issue for the jury.

---

[16]     The submitted medication administration log indicates that Plaintiff received 1 dose of the pain medication on November 11, 2016, both doses the following day, was a no show for pill call the next two days, received a single dose on November 15, 2016, and was a no show for his last two doses to be administered.  (Doc. 89-18 at 19).  Plaintiff, on the other hand, denies that he received pain medication.   Consequently, there is a question of fact as to the degree of pain Plaintiff suffered.

Turning to the subjective prong, taking Plaintiff's allegations as true, as the Court must at this stage, Defendants Fails, Whitley, Finklea, Fleeton, and Edmonds knew that Plaintiff was hit and hit with enough force to knock his dental plate out.  And, based on the facts contained in Defendants' special reports, there is no doubt that Defendants Vignolo, Fails, and Kidd had full knowledge that the CERT Team had entered B-Dorm and many inmates had been beaten and suffered injuries.  It is with this knowledge that Defendants Fails and Kidd responded in the negative to Vignolo's radioed request.

Such a denial to Plaintiff's need for treatment could be viewed by a fact-finder as "poor enough to constitute 'an unnecessary and wanton infliction of pain,' and not merely accidental inadequacy."  Taylor, 221 F.3d at 1258 (quoting Estelle, 429 U.S. at 105).  A reasonable jury could also credit Plaintiff's version of the events based on the fact that Vignolo radioed for an infirmary escort in the first place.  Notably, if Plaintiff did not appear to require medical attention, Vignolo would not have radioed in the request; rather, he would have simply denied Plaintiff's request unilaterally.  In determining the subjective culpability of the defendants, the undersigned takes guidance from the Supreme Court's explanation that "[w]hile the obviousness of a risk is not conclusive . . . [a defendant can] not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist. . . ."  Farmer, 511 U.S. at 843 n.8. Accordingly, Plaintiff has plead facts sufficient to show a plausible claim that a reasonable jury could find Defendants Vignolo, Fails, and Kidd had actual knowledge of a risk of harm to Plaintiff and acted with deliberate indifference to Plaintiff's medical needs.

Thus, it is recommended that **Defendants Fails, Whitley, Finklea, Fleeton, Edmonds, and Kidd** are **DENIED** summary judgment as to the claim of denial or delay of medical care.

### C. Assault and Battery.

Plaintiff asserts state law claims of assault and battery against the correctional officer defendants.  As discussed *supra,* there remains a question of material fact as to the appropriateness of force used against Plaintiff.  Similarly, there remains a question as to whether CERT Team defendants are liable for state law assault claims.  Out of an abundance of caution, it is recommended that the state law claims of assault and battery be carried along with the alleged Eighth Amendment violations of excessive force.  Accordingly, **Defendants Whitley, Fails, Finklea, Fleeton, Edmonds, and Culliver** are **DENIED** summary judgment as to the claim of assault and battery, at this time.

It is further recommended that the **remaining Defendants** be **GRANTED** summary judgment as the state law claims of assault and battery asserted against them and that such claims be dismissed for failure to state a claim.

### D. Request for Declaratory and Injunctive Relief.

In addition to monetary relief, Plaintiff requests a declaratory judgment and injunctive relief.  A remedy for declaratory relief is created by 28 U.S.C. § 2201(a), which provides that "[i]n a case of actual controversy . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).  "Declaratory relief is by its nature prospective."  McGee v. Solicitor Gen. for Richmond Cnty., Ga., 727 F.3d 1322, 1325 (11th Cir. 2013). That is, it is "[i]n contrast . . . [to] a claim

for money damages [that] looks back in time and is intended to redress a past injury." Adler v. Duval Cnty. Sch. Bd., 112 F.3d 1475, 1477 (11th Cir. 1997). Thus, to have standing to seek declaratory relief, a plaintiff "'must show a sufficient likelihood that he will be affected by the allegedly unlawful conduct in the future.'" Koziara v. City of Casselberry, 392 F.3d 1302, 1305 (11th Cir. 2004) (quoting Johnson v. Bd. of Regents of Univ. of Ga., 263 F.3d 1234, 1265 (11th Cir. 2001)).  "[T]he continuing controversy may not be conjectural, hypothetical, or contingent; it must be real and immediate, and create a definite, rather than speculative threat of future injury." Emory v. Peeler, 756 F.2d 1547, 1552 (11th Cir. 1985).  A remote possibility of a future injury occurring is not adequate to meet the "actual controversy" requirement for declaratory relief. Id. The plaintiff must allege facts from which the continuation of the dispute may be reasonably inferred. Ciudadanos Unidos de San Juan v. Hidalgo Cnty. Grand Jury Comm'rs, 622 F.2d 807, 821-22 (5th Cir. 1980), cert. denied, 450 U.S. 964, 101 S. Ct. 1479, 67 L. Ed. 2d 613 (1981).

Plaintiff has not made a specific showing (or even an allegation) that there is any likelihood he will be subjected to unlawful conduct by a named Defendant in the future. See City of Los Angeles v. Lyons, 461 U.S. 95, 104, 103 S. Ct. 1660, 75 L. Ed. 2d 675 (1983) (merely asserting that one may again be subject to unlawful conduct does not generally give rise to standing to demand prospective relief). Thus, Plaintiff's claim for declaratory relief fails "to satisfy the threshold 'case or controversy' requirement of article III and the 'actual controversy' prerequisite of 28 U.S.C. § 2201" and, therefore, is subject to dismissal. See Emory, 756 F.2d at 1552.

Similarly, "[b]ecause injunctions regulate future conduct, a party has standing to seek injunctive relief if the party alleges . . . a real and immediate — as opposed to a merely conjectural or hypothetical - threat of *future* injury." Church v. City of Huntsville, 30 F. 3d 1332, 1337 (11th Cir. 1994) (emphasis in original). A review of Plaintiff's complaint reveals no allegation or claim of future harm. Accordingly, Plaintiff's claim for injunctive relief is due to be dismissed.

### IV.   Conclusion.

Based on the foregoing, the undersigned recommends the following:

1. As to Plaintiff's Eighth Amendment violation for denial of medical care, summary judgment should be **DENIED** as to **Defendants Whitley, Fails, Finklea, Fleeton, Edmonds, and Kidd** and **GRANTED** in favor of all other Defendants;

2. As to Plaintiff's Eighth Amendment claim of excessive force and state claim of assault and battery, summary judgment should be **DENIED** as to **Defendants Whitley, Fails, Finklea, Fleeton, Edmonds, and Culliver**, and **GRANTED** as to all other Defendants.

3. As to Plaintiff's Eighth Amendment failure to protect claim, summary judgment should be **DENIED** as to **Defendants Whitley, Fails, Finklea, Fleeton, Edmonds**, **and Culliver** and **GRANTED** as to all other named officer defendants.

The instructions that follow the undersigned's signature contain important information regarding objections to the report and recommendation of the Magistrate Judge.

### Notice of Right to File Objections

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court. See 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 72(b);

S.D. ALA. GenLR 72(c).  The parties should note that under Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object.  In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice." 11th Cir. R. 3-1.  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

**DONE** this the 4th day of February, 2020.


s/ P. Bradley Murray
UNITED STATES MAGISTRATE JUDGE